HANOVER INSURANCE COMPANY vs. KARIM TALHOUNI & others.[1]

Middlesex. November 2, 1992. - December 11, 1992.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Insurance*, Homeowner's insurance, Coverage. *Intent. Intoxication. Evidence*, Expert opinion.

Discussion of the legal effect of an insured's voluntary intoxication in determining the applicability of an insurance policy provision that excludes liability coverage for injuries intentionally caused by the insured. [784-787]

At the trial of a declaratory action in which an insurer sought to establish the applicability of an exclusionary clause in a policy of homeowner's insurance, the judge was warranted in finding that the insured, when he inflicted personal injuries and other damage after ingesting a quantity of the drug LSD, lacked the capacity to form intent for purposes of the policy clause excluding coverage of "bodily injury or property damage . . . which is expected or intended by the insured"; consequently, the damages resulting from the incident were covered by the policy. [787]

The criminal responsibility test of *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), was not applicable to the question of an insured's capacity to form intent for purposes of an insurance policy provision excluding coverage of "bodily injury or property damage . . . which is expected or intended by the insured." [787-788]

At a civil trial, a psychiatrist's expert opinion testimony had an adequate basis in the record and was not tainted by the expert's possible exposure to hearsay. [788-790]

CIVIL ACTION commenced in the Superior Court Department on November 2, 1988.

The case was heard by *Patrick F. Brady*, J.

The Supreme Judicial Court granted a request for direct appellate review.

---

[1]Barbara Talhouni, Glenn Scott, and Cornelia Pillard.

*John D. Boyle* (*Lois M. Farmer* with him) for the plaintiff.

*Keith S. Halpern* (*Thomas J. Doherty* with him) for Glenn Scott & another.

*Carol Stroud Ball* for Karim Talhouni, was present but did not argue.

NOLAN, J. During the afternoon of March 16, 1985, Karim Talhouni (Talhouni) ingested a quantity of the drug lysergic acid diethylamide (LSD). On previous occasions he had taken LSD and had experienced mild visual hallucinations, mild euphoria, and increased energy. Talhouni had heard of persons who had taken LSD and injured themselves, but he had never heard of anyone on LSD acting violently or causing injury to others. On this day, however, Talhouni was to have his first "bad trip."

After ingesting the LSD, Talhouni travelled from Belmont to Cambridge. Talhouni had not met Cornelia Pillard or Glenn Scott nor had he ever visited their apartment. Yet, inexplicably, Talhouni was led to their door.

Cornelia Pillard readied for an afternoon run. At the time, her roommate, Glenn Scott, was napping. Prepared to depart, Pillard opened the door to her third-floor apartment when she observed Talhouni racing up the stairs toward her. Pillard retreated into her bedroom and barricaded her door. Talhouni continued his approach, entered the apartment and burst into Glenn Scott's bedroom.

Talhouni was "a wild man out of control." He was "growling and mumbling in what appeared to be a foreign language." Talhouni knelt on Scott's bed. Scott awoke. Talhouni pulled down his pants, exposed his penis and urinated on her. He grabbed her around the neck, thrashed her head back and forth and pinched her about her breasts and upper extremities. Scott heard him say "kill the bitch" and "the bitch must die."

In the meantime, Pillard left her bedroom and descended the stairs. Pillard secured the assistance of another tenant, returned to the apartment and entered Scott's bedroom. The assault was still in progress; they shouted at Talhouni to

leave. Their efforts were in vain. The assault continued and the two sought further assistance.

After a time, Talhouni escaped Scott's bedroom, ran down the stairs and crashed through the glass entry door. Officers Gardner and Cromwell of the Cambridge police department had arrived at the scene where they observed Talhouni "thrashing about, 'like a fish out of water,' in the broken glass." In the words of the trial judge, "Talhouni was oblivious to the fact that he was cutting himself, and did not appear to recognize Gardner and Cromwell as police officers. The officers extricated him from the glass and strapped him to a stretcher. Talhouni was then transported to Cambridge City Hospital."[2]

At the time of the incident, Karim Talhouni's mother, Barbara Talhouni, had a contract of insurance ("homeowners" insurance policy) with Hanover Insurance Company (Hanover). Karim Talhouni is an insured under its terms.[3] The relevant portion of the policy describing coverage for personal liability provides, "If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which coverage applies, [Hanover] will . . . pay up to [the] limit of liability for the damages for which the insured is legally liable."[4] An exclusion clause provides that personal liability coverage "do[es] not apply to bodily injury or property damage . . . which is expected or intended by the insured."

Cornelia Pillard and Glenn Scott subsequently commenced suit against Karim Talhouni seeking to recover for personal injuries and other damages.[5] Hanover appeared in that civil

---

[2]At the time of the incident, Talhouni was eighteen years of age.

[3]Under the policy the "insured" include the policyholder, residents of the policyholder's house who are relatives and other persons under the age of twenty-one in the care of the policyholder.

[4]In addition to the indemnity provision, the contract contained a provision requiring the insurer to defend the insured in suits brought against the insured for personal injuries or damage to property not excluded from coverage.

[5]In October, 1985, Karim Talhouni was convicted of indecent assault and battery in connection with the March incident.

suit and later brought this declaratory judgment action to establish that Karim Talhouni's conduct is excluded from coverage because the resultant injury was "expected or intended by the insured."[6] After a motion judge denied cross motions for summary disposition, the case was tried without a jury. In his memorandum of decision and order for judgment, the trial judge denied Hanover the declaratory relief sought and Hanover brought this appeal.[7] We granted Hanover's request for direct appellate review, and affirm.

This court has considered the applicability of exclusionary clauses for intentional injury in view of certain types of conduct. See, e.g., *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 83 (1984). In this context, we have stated that "the resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Id.* at 84. The focus in these cases is whether the insured "intended" the injury, not whether the insured "intended" the act. Of course, the insured need not intend to cause the precise injury which occurred for the exclusion to apply. See *Newton* v. *Krasnigor*, 404 Mass. 682, 686 (1989).

Our relevant cases consist of two strands. The first strand is comprised of cases where we held that an intent to cause injury existed as a matter of law due to the nature of the act. See *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393, 399-400 (1990) (forceful sexual molestation and rape). See also *Terrio* v. *McDonough*, 16 Mass. App. Ct.

---

[6]We have previously held that the term "expected" does not broaden the exclusion beyond acts "intended" by the insured. See *Quincy Mut. Fire Ins. Co.* v. *Abernathy*, 393 Mass. 81, 84-86 (1984).

[7]The underlying tort suit was tried before a jury who found in favor of plaintiff Scott and awarded her $65,000 in damages. The jury also found in favor of plaintiff Pillard, awarding her $2,000. The court subsequently allowed Talhouni's motion for judgment notwithstanding the verdict with respect to the Pillard claim because she did not suffer any personal injury. Neither of these claims is at issue on this appeal.

163, 169 (1983) (person pushed down stairs). In such a case the exclusion clause applies.

The second strand is comprised of cases where the issue of the insured's intent to cause injury is a question for the fact finder. See *Quincy Mut. Fire Ins. Co.* v. *Abernathy, supra* at 87 (factual question whether insured intentionally sought to injure driver and passenger when he threw a piece of blacktop at their car). In such a case, "the dispositive question is whether . . . the [insured] intended, or knew with substantial certainty, that some injury would result from his conduct." *Kowalski* v. *Gagne*, 914 F.2d 299, 304 (1st Cir. 1990).

Hanover relies on cases from the former category, principally *Fells Acres*, to argue that we should infer the intent to cause injury from the nature of Talhouni's act and thereby relieve Hanover of any duty to defend and indemnify. We disagree. *Fells Acres* is not dispositive as it involved physical acts warranting the inference that the insured intended the resulting harm and did not involve what we believe to be the decisive issue here, i.e., capacity to form intent.

We have previously discussed the relationship between an insured's mental capacity and ability to form "intent." See *Baker* v. *Commercial Union Ins. Co.*, 382 Mass. 347, 350-351 (1981). In *Baker*, we stated the general rule that "[i]f the insured was insane at the time that he wilfully or intentionally caused the [harm], the insurer remains liable on the policy." *Id.* at 350. In *Fells Acres*, we referred again to the need to consider evidence on the capacity issue in determining whether an insured acted with the requisite intent for the purposes of the exclusion. See *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc., supra* at 401.

Underlying these decisions is the principle that the insurer must show the applicability of the clause excluding coverage for injury or damage intended or expected by the insured. See *McGinnis* v. *Aetna Life & Casualty Co.*, 398 Mass. 37, .38 (1986). To this end, Hanover must show that Talhouni intended the injuries that resulted from his conduct. Despite

Hanover's protestations, we decline to adopt a different rule where the capacity question arises from voluntary intoxication.

In advancing its theory that we should adopt a special rule covering circumstances where the question of capacity to form intent arises due to voluntary intoxication, Hanover cites appellate decisions from three jurisdictions, Michigan, Minnesota, and Missouri. See *Group Ins. Co.* v. *Czopek*, 440 Mich. 590, 629 n.24 (1992) (Levin, J., dissenting), citing cases. See also Annot., Liability Insurance: Intoxication or Other Mental Incapacity Avoiding Application of Clause in Liability Policy Specifically Exempting Coverage of Injury or Damage Caused Intentionally by or at Direction of Insured, 33 A.L.R. 4th 983, 1006-1007 (1984). These courts have held that voluntary intoxication cannot serve to vitiate capacity for purposes of the exclusion. See, e.g., *Group Ins. Co.* v. *Czopek*, *supra* at 628-629. To the extent one can discern a common thread running through these decisions, it seems to be the public policy argument that the law cannot permit voluntary intoxication to be a defense for one's actions. See, e.g., *Hanover Ins. Co.* v. *Newcomer*, 585 S.W.2d 285, 289 (Mo. Ct. App. 1979). But see *American Family Mut. Ins. Co.* v. *Peterson*, 405 N.W.2d 418, 422 (Minn. 1987) (insured cannot reasonably expect assault committed while voluntarily intoxicated to be covered).

At least seven other jurisdictions, however, have decided that "intoxication may destroy, for purposes of the exclusion, the capacity to form the requisite intent." *Group Ins. Co.* v. *Czopek*, *supra* at 629 & n.25, citing cases. See also Annot., 33 A.L.R. 4th, *supra* at 1000-1001. Considerations warranting this decision include "public interest that the victim be compensated," and the view that "the victim is aided by the narrowest view of the policy exclusion." *Burd* v. *Sussex Mut. Ins. Co.*, 56 N.J. 383, 398 (1970). See *Vappi & Co.* v. *Aetna Casualty & Sur. Co.*, 348 Mass. 427, 431 (1965) ("[e]xclusions from coverage are to be strictly construed").

We are persuaded by the arguments underlying the majority rule. The majority rule is consistent with our prior deci-

sions on the subject which hold that evidence of voluntary intoxication is relevant to determining the presence or absence of intent with reference to an exclusion clause.

It is unlikely that the rule enunciated today will encourage insured individuals to seek sufficient intoxicants to negate capacity and preclude personal liability for otherwise intentional acts. Indeed, where it could be said that an insured voluntarily indulged in intoxicants "to fortify his resolve to inflict injury" to persons or property, a different result from that which we reach today would likely follow. See Fischer, The Exclusion From Insurance Coverage of Losses Caused by the Intentional Acts of the Insured: A Policy in Search of a Justification, 30 Santa Clara L. Rev. 95, 147 (1990).

Accordingly, the question in the instant case reduces to whether the trial judge erred in holding that Talhouni did not know with substantial certainty that some injury would result from his conduct. In reaching his conclusion the trial judge found that "[a]t the time of the events in question, [Talhouni] was completely out of touch with reality, was hallucinating and delusional, and did not know that he was assaulting another human being." There is no error in the trial judge's finding that Talhouni lacked the capacity to form intent for purposes of the exclusionary clause. Indeed, the trial judge's decision is supported by the great weight of the evidence.

There is also no merit to the argument that Talhouni took the drug expecting or intending the ultimate result. The trial judge found that "[a]t the time that [Talhouni] took the LSD . . . he did not 'expect or intend' that he would be affected by the drug in a way that he would assault or hurt another human being." We see no reason to disturb this finding.

Hanover advances two additional arguments. First, Hanover argues that the trial judge erred in failing to apply the criminal responsibility test of *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967), to the question of capacity to formulate intent under the intentional "act" exclusion. Hanover would have us adopt *McHoul* as the test to deter-

mine whether an insured lacks capacity to form intent for purposes of the exclusion. In developing its argument, Hanover relies on *Baker* v. *Commercial Union Ins. Co.*, 382 Mass. 347, 349-350 (1981), and *Fells Acres, supra* at 401.

In *Baker*, the trial judge instructed the jury that the insurer would be liable to the insured only if the jurors believed that the insured was insane at the time the insured committed the act. *Baker, supra* at 349. The trial judge defined insanity using the *McHoul* formulation. *Id.* at 349 n.5. In *Baker*, we accepted the *McHoul* formulation as the law of the case and expressed no opinion as to whether it was "the appropriate standard in these circumstances." *Baker, supra* at 349-350 n.5.

Later, in *Fells Acres*, noting the absence of any evidence tending to support a conclusion that the insured lacked the capacity to form an intent, we stated, "Nowhere in the record is there a jot of evidence suggesting that the tort defendants were suffering from a mental disease or defect that would render them incapable of forming an intent to harm the . . . plaintiffs." *Fells Acres, supra* at 401. Hanover points to our use of the phrase "suffering from a mental disease or defect" in *Fells Acres*, notes its presence in the *McHoul* test and concludes that this suggests our inclination to adopt the *McHoul* standard for the purposes of the exclusion. We disagree. As noted above, the reference in *Fells Acres* expressed the view that the parties must present evidence indicating that the insured is capable, or incapable as the case may be, of forming the intent to harm.

We need not, however, rest our holding solely on these grounds, for we conclude that the *McHoul* test is not applicable here. The *McHoul* test gauges criminal responsibility. The question in the present case is whether Talhouni had the requisite intent to cause the complained-of injuries, thereby relieving Hanover of its duty to defend and indemnify.

Hanover's final argument concerns the testimony of a psychiatrist on the issue of Talhouni's capacity to form intent. The psychiatrist testified as to Talhouni's specific mental state on the date of the event. Hanover argues that the doc-

tor's opinion was impermissible conjecture and was based on facts not in evidence. We find these arguments without merit.

As Talhouni's capacity to form an intent is the central issue of the dispute, evidence tending to show that capacity did or did not exist is relevant. In the present case Talhouni's lack of responsibility was an issue on which expert testimony was properly allowed and probably required. See *Baker,* *supra* at 351 n.7. Expert opinion testimony is properly based "on facts of which [the expert] has adequate direct personal knowledge, on facts assumed (as when asked a hypothetical question) as to which there is evidence in the case, on testimony of witnesses, or a combination of these sources." P.J. Liacos, Massachusetts Evidence 114 (5th ed. 1981).

In the present case the doctor set forth the factual predicate on which he relied to form his opinion. The doctor testified that he based his opinion on the deposition testimony of Scott, Pillard, and Talhouni, and a medical record from Cambridge City Hospital. But the facts on which the doctor relied, while largely drawn from deposition testimony, were testifed to at trial. There is ample support in the record for the doctor's testimony. Accordingly, there is no error on this point.

In a collateral evidentiary matter, Hanover argues that the doctor's opinion testimony is tainted because he "relied" on inadmissible hearsay. We disagree. While the doctor did testify that he was exposed to documentary evidence not admitted in evidence, the doctor did not say he relied on these sources. The doctor *said*: "I reviewed the medical record of the Cambridge Hospital emergency room where Mr. Talhouni was treated, the testimony of Dr. [Zigelbaum] before the Middlesex Superior Court, the depositions of Glenn Scott, [Cornelia] Pillard, Barbara Talhouni, [Karim] Talhouni, a letter from Dr. Theoharides from Tufts, and some — a document labeled supplemental answers of Hanover Insurance Company to plaintiff Glenn Scott's first set of interrogatories, a psychiatric report on Mr. Talhouni prepared by Dr. [Zigelbaum], and the office notes of Dr. Alan

Kaplan." Assuming arguendo that the disputed evidence is hearsay, an expert's exposure to hearsay does not imply reliance thereon in the formulation of an opinion. *Commonwealth* v. *Harris*, 1 Mass. App. Ct. 265, 267 (1973). See P.J. Liacos, Massachusetts Evidence 112 (5th ed. 1981). See also Fed. R. Evid. 703.

*Judgment affirmed.*