NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-32                                          Appeals Court

LIBERTY MUTUAL FIRE INSURANCE COMPANY  vs.  RYAN CASEY
& another.[1]


No. 16-P-32.

Essex.     November 7, 2016. - March 29, 2017.

Present:  Cypher, Massing, & Sacks, JJ.


Insurance, Homeowner's insurance, Insurer's obligation to
     defend.  Intentional Conduct.



     Civil action commenced in the Superior Court Department on
May 22, 2014.

     The case was heard by Robert A. Cornetta, J., on motions
for summary judgment.


     Richard J. Fallon for Ryan Casey.
     Joseph M. Orlando, Jr., for Evan Williams.
     John P. Graceffa for the plaintiff.


     SACKS, J.  Twice on the same evening, after consuming

alcohol and marijuana, Ryan Casey attacked Evan Williams without

warning, punching and kicking him in the face and causing him

serious bodily injury.  Casey later admitted that he "intend[ed]

_____

     [1] Evan Williams.

to touch" Williams, and that he understood, at least at the time of his deposition, that "[w]hen you hit somebody with a fist . . . you know you're going to do some level of injury." Williams subsequently made a claim under the homeowners insurance policy on Casey's familial home.  The insurer, Liberty Mutual Fire Insurance Company (Liberty Mutual), responded by commencing this action seeking a declaration that it had no duty to defend or to indemnify Casey, or to pay medical expenses for Williams, due to an exclusion in the policy for bodily injury "[w]hich is expected or intended by the insured."  On cross motions for summary judgment, a Superior Court judge ruled in favor of Liberty Mutual, concluding as a matter of law that Casey expected or intended to cause Williams bodily injury. Williams and Casey appeal, arguing that there is a genuine issue of material fact regarding Casey's intent to injure.[2]  We affirm.

    1.  Background.  We recount certain undisputed material facts from the summary judgment record, reserving for later

_____

    [2] We note that Williams and Casey filed their notices of appeal before judgment entered.  See Mass.R.A.P. 4(a), as amended, 464 Mass. 1601 (2013) (notice of appeal must be filed within thirty days of entry of judgment).  Because Liberty Mutual does not raise the issue and we see no prejudice, we reach the merits of the appeal.  See Swampscott Educ. Assn. v. Swampscott, 391 Mass. 864, 865-866 (1984) ("[A] decision on the merits should not be avoided on the technicality that a premature notice of appeal was or may have been filed, where no other party has been prejudiced by that fact").  See also Matter of a Care and Protection Summons, 437 Mass. 224, 231 n.14 (2002).

discussion the facts concerning Casey's intent. On the evening of June 26, 2013, Casey, then seventeen years old, attended the St. Peter's fiesta celebration (fiesta) in Gloucester with two friends, Dylan Chaney and Forrest Turner. Prior to arriving, Casey had consumed alcohol and smoked marijuana.[3] At some point while at the fiesta, Casey encountered Williams, also seventeen years old, and the two left on foot in the company of Chaney and Turner, allegedly to go smoke marijuana.[4] After the group arrived at a remote location nearby, Casey "sucker punched" Williams in the face with a closed fist. Casey then punched Williams in the face several more times, kicked him in the face once, and departed with Chaney and Turner, leaving Williams seriously injured on the ground.

Eventually, Williams got to his feet and located the other three nearby. As Williams approached, and spoke with Chaney and Turner, Casey separated from the group, came up behind Williams, and again "sucker punched" him in the face with a closed fist, causing additional serious bodily injuries. Casey, Chaney, and Turner then departed for a second time.[5]

---

[3] Casey could not recall at deposition how much he had consumed, but estimated that he had smoked marijuana multiple times and had drunk more than five or six alcoholic beverages.

[4] See note 14, infra.

[5] Williams attempted to walk home, but gave up and telephoned his mother, who came and took him to a local

Subsequently, Casey was indicted for the attacks and pleaded guilty to assault and battery by means of a dangerous weapon (shod foot) and assault and battery causing serious bodily harm.[6] He was sentenced for the first offense to two and one-half years in a house of correction, with two years to be served and the balance suspended while he served a three-year period of probation for the second offense.

Williams then made a claim under the Liberty Mutual homeowners insurance policy of Casey's parents.[7] Potentially, both Casey and Williams are entitled to coverage under the policy. As an insured under the policy, Casey is potentially entitled to a defense and to "personal liability" coverage (coverage E) "[i]f a claim is made or a suit is brought against [him] for damages because of 'bodily injury' . . . caused by an 'occurrence' to which [the] coverage applies." Williams, in turn, is potentially entitled to "medical payments to others"

---

hospital. Due to the severity of his injuries, Williams was transferred to a Boston hospital, where he underwent surgery.

[6] During the plea colloquy, Casey agreed with the prosecutor's summary of the evidence. A guilty plea, unlike a guilty verdict rendered by a jury, is only evidence of intent in a civil action; it is not conclusive. See Aetna Cas. & Sur. Co. v. Niziolek, 395 Mass. 737, 747 (1985); Flood v. Southland Corp., 416 Mass. 62, 70 (1993).

[7] After Liberty Mutual filed this action, Williams filed an action against Casey and his father, which Liberty Mutual informs us has been stayed pending the resolution of this appeal.

coverage (coverage F) for "bodily injury" that "[i]s caused by the activities of an 'insured.'" The policy contains certain "exclusions," however, including a clause providing that coverage E and coverage F "do not apply to 'bodily injury' . . . [w]hich is expected or intended by the 'insured', even if the resulting 'bodily injury' . . . is of a different kind, quality, or degree than initially expected or intended." It is that clause that the judge held excludes coverage for Casey and Williams.[8]

2. <u>Standard of review</u>. Our review of the summary judgment is de novo, meaning we consider all of the evidence that was before the motion judge and draw all reasonable inferences therefrom in a light most favorable to Casey and Williams. See <u>Miller</u> v. <u>Cotter</u>, 448 Mass. 671, 676 (2007); <u>Albahari</u> v. <u>Zoning Bd. of Appeals of Brewster</u>, 76 Mass. App. Ct. 245, 248 n.4 (2010). Liberty Mutual, as the moving party, has the burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. See <u>Drakopoulos</u> v. <u>U.S. Bank Natl. Assn</u>., 465 Mass. 775, 777 (2013).

---

[8] The judge had denied an earlier motion for summary judgment filed by Williams because, inter alia, "the issue of intent is a question of fact in dispute." After further discovery, including Casey's deposition, the judge granted Liberty Mutual's motion, leading to the present appeal.

3.  Discussion.  The "expected or intended" language of the exclusionary clause at issue here has been considered by the Supreme Judicial Court in several cases.  See Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 83-86 (1984); Newton v. Krasnigor, 404 Mass. 682, 684-686 (1989); Worcester Ins. Co. v. Fells Acres Day Sch., Inc., 408 Mass. 393, 399-400 (1990) (Fells Acres); Hanover Ins. Co. v. Talhouni, 413 Mass. 781, 783-787 (1992); Doe v. Liberty Mut. Ins. Co., 423 Mass. 366, 369-371 (1996).  Those cases establish that, to prevail at the summary judgment stage based on the exclusion, Liberty Mutual must establish that there is no genuine dispute that Casey "intended, or knew with substantial certainty, that some injury would result from his conduct."  Talhouni, supra at 785, quoting from Kowalski v. Gagne, 914 F.2d 299, 304 (1st Cir. 1990).  See Abernathy, supra at 87 ("two crucial issues" are "whether [the insured] intended . . . to cause injury . . . or whether [the insured] knew to a substantial certainty that such injuries would ensue from his actions").[9]  This does not require Liberty Mutual to prove that Casey intended to cause "the precise

_____

[9] In Abernathy, the court explained the effect of including the word "expected" in the disjunctive ("expected or intended"), 393 Mass. at 84, in the exclusionary clause:  "Our cases have concluded that an injury is nonaccidental only where the result was actually, not constructively, intended, i.e., more than recklessness. . . .  This standard requires a showing that the insured knew to a substantial certainty that the bodily injury would result.  Thus, we conclude the word 'expected' brings no change to our well-defined concept of 'accident.'"  Id. at 86.

injury" that occurred.  Talhouni, supra at 784, citing Krasnigor, supra at 686.

Liberty Mutual's burden is not insubstantial.  Intent to injure has been inferred as a matter of law in only a few cases involving exclusionary clauses.[10]  In Fells Acres, the Supreme Judicial Court ruled that the rape and sexual assault at issue there, "because of their direct and forcible nature," required the court to "conclude, as a matter of law, that the insureds intended to cause at least some injury."  408 Mass. at 400.  Such acts were, by their nature, "indistinguishable from any other deliberate assault and battery."  Ibid.  As the court further explained, "[t]he act of striking another in the face is one which we recognize as an act so certain to cause a particular kind of harm that we can say a person who performed the act intended the resulting harm, and his statement to the contrary does nothing to refute that rule of law."  Ibid. (citation omitted).  "[R]eason mandates that from the very nature of the act, harm to the injured party must have been intended."  Ibid. (citation omitted).

---

[10] The limited number of cases in this area is consistent with the concern that "where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate."  Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).  See Abernathy, 393 Mass. at 86 (summary judgment "disfavored" in such cases).  "That is not to say, however, that, in such cases, summary judgment is always inappropriate."  Brunner v. Stone & Webster Engr. Corp., 413 Mass. 698, 705 (1992).

Other decisions inferring intent to injure as a matter of law from the nature of the act include Krasnigor, 404 Mass. at 687-688 (insured's intentional setting of fire inside school, absent evidence of any other motive such as need for warmth or light, implied, as matter of law, intent to cause some property damage); Doe, 423 Mass. at 369 ("Although an adult who engages in unlawful sexual behavior toward a minor may not subjectively intend to harm the child, . . . intent to injure is inferred as a matter of law"); and Terrio v. McDonough, 16 Mass. App. Ct. 163, 169 (1983) ("[I]t is self-evident that if a person is pushed down a flight of stairs it is to be expected that person will be hurt").[11]

Here, it is undisputed that Casey punched Williams multiple times and kicked him once in the face -- acts that, under Fells Acres, 408 Mass. at 400, mandate as a matter of law an inference

---

[11] To be sure, not every assault and battery mandates an inference of intent to injure for exclusion clause purposes. Like here, assaults and batteries occurred in Abernathy, 393 Mass. at 82, 87 n.4, and Preferred Mut. Ins. Co. v. Gamache, 42 Mass. App. Ct. 194, 196 n.5, S.C., 426 Mass. 93 (1997), but the particular nature of the acts at issue in those cases did not mandate such an inference. As the Supreme Judicial Court cautioned in Krasnigor, 404 Mass. at 686 n.7, the inference of intent:

"is not based on the tort principle that one is considered to have intended the natural and ordinary consequences of one's voluntary act. Rather, [i]t is a much more narrow gauge that recognizes the correlation [between act and intent] only where reason mandates that from the very nature of the act, harm to the injured party must have been intended" (quotation omitted).

of intent to cause harm. Casey and Williams nevertheless maintain that there is a genuine dispute of material fact as to whether Casey's voluntary consumption of alcohol and marijuana before the attacks prevented him from forming the intent to injure Williams, thereby precluding the entry of summary judgment. On this record, we disagree.

Casey was arrested by the Gloucester police one week after the attacks and was interviewed by two detectives.[12] The transcript of the interview reflects that, when queried about the reason behind his actions, Casey explained that he had lent Williams money to purchase marijuana approximately one year earlier, and Williams had not fully repaid him. In Casey's view, Williams had "robbed" him, and that thought came back to him when he saw Williams at the fiesta, causing him to become "pretty heated."[13]

---

[12] Casey argues that some of the detectives' questions were coercive and misleading and, in essence, that his subsequent deposition testimony is entitled to greater weight. Casey neither made this argument in his summary judgment opposition papers nor offered any evidence that would support it. Casey never stated in his deposition or otherwise that the police questioning was coercive or misleading, nor did he expressly disavow anything he had told the police. In any event, his deposition testimony does not contradict in any material way what he told the police.

[13] "So we all get down there and by this time I was fairly intoxicated and I confronted [Williams] and then I hit him and I was already pretty heated about the situation before because when -- seeing him brought back like, you know, he robbed me and

As the group started walking away from the fiesta in order to smoke marijuana,[14] the "wheels started spinning" in Casey's mind and he thought to himself, "OK, when [he got] down there," he was going to "whack" Williams; Casey made a "plan to hit him."  And, by Casey's own admission, he proceeded to do just that; he "sucker punched" and kicked Williams.  Furthermore, when asked whether someone else had held Williams's arms during the first attack, Casey said, "I wouldn't let that happen.  No. The problem I had was between me and him.  That's how I wanted to solve it.  Just me and him."  Finally, when Williams found and approached the trio after the first attack, Casey admitted that he "snuck around again and . . . hit him again."

It is undisputed, therefore, that Casey had both a clear motive and a purposeful plan to "solve" his "problem" with Williams.  The plan, even if not thought out far in advance or in great detail, included using "sucker punche[s]" and repositioning himself in order to make a "sn[ea]k" attack when the opportunity presented itself.

Later, at his deposition, Casey stated:  "I wouldn't have done what I did if I wasn't intoxicated"; "I attacked him

---

everyone knew it, so everyone was talking about it.  You know, I got heated. I lost my cool and . . . [y]eah."

[14] Although Casey told the police that this was the group's plan, Williams denied that he intended to or did smoke marijuana after leaving the fiesta.  No party contends that this dispute is material.

because I wasn't in the right state of mind"; "I planned it while I was intoxicated that night"; "If I wasn't drunk, I wouldn't have planned it;" and "[I] lost control."  Casey and Williams maintain that these and similar statements create a genuine dispute regarding Casey's intent to injure.  Again, we disagree.

These statements merely further explain, rather than contradict, Casey's earlier statements -- a number of which he adopted at his deposition -- regarding his motive and plan for attacking Williams.  Taken as a whole, Casey's statements, when viewed in a light most favorable to him, establish that the effects of the alcohol and marijuana, acting in combination with his preexisting anger at Williams, led to the attacks.  Even though he was under the influence of alcohol and marijuana, however, he was by his own admission not so significantly under the influence or "out of control" that he lost the capacity to plan, and to act effectively on that plan.[15]

Casey testified that he attacked "because [he] wasn't in the right state of mind" and "because [Williams] owed [him] money and [Williams] was trying to stiff [him] and [he was]

---

[15] At Casey's deposition, counsel for Williams asked whether, before or at the time Casey began to consume alcohol and marijuana on the day in question, he had any intent to attack Williams, and Casey answered that he did not.  This testimony created no genuine issue of material fact, given Casey's admission that after he began to consume alcohol and marijuana, he did, in fact, formulate a "plan to hit" Williams.

upset."  Asked why he felt it necessary to attack Williams a second time, Casey replied, "I wasn't thinking"; when asked how that attack occurred, he agreed that "I kind of snuck around again and I hit him again," illustrating that he retained sufficient capacity to plan a more effective attack.  Casey remembered punching, kicking, and then leaving Williams.  Casey agreed that he was not forced to kick Williams; rather, he did so of his "own free will."

Finally, and most significantly, Casey admitted that he "intend[ed] to touch" Williams, and that he (Casey) understood, at least at the time of his deposition, that "[w]hen you hit somebody with a fist . . . you know you're going to do some level of injury."  Notwithstanding Casey's conclusory testimony to the effect that he did not "intend to injure" Williams, his capacity to form the intent to hit Williams, therefore, was established beyond dispute, and thus under Fells Acres, 408 Mass. at 400, his intent to injure Williams is inferred.  "[H]is statement to the contrary does nothing to refute that rule of law."  Ibid. (citation omitted).

Indeed, because Casey intended to commit the inherently harmful act, his subjective intent as to the degree of injury he intended to cause is irrelevant.  See Doe, 423 Mass. at 369 ("Although an adult who engages in unlawful sexual behavior toward a minor may not subjectively intend to harm the child,

. . . intent to injure is inferred as a matter of law"); id. at 370-371 ("Although the adverse consequences may not have been intended, the act itself was still intentional").  See also Fells Acres, 408 Mass. at 400-401 ("The mere fact that, as a group, child abusers have a variety of motives does not render their harmful actions unintentional").

These facts distinguish the present case from Talhouni, where the insured had taken lysergic acid diethylamide (LSD) prior to committing an indecent assault and battery.  413 Mass. at 782, 783 n.5.  There the court characterized Fells Acres as "not dispositive[,] as it involved physical acts warranting the inference that the insured intended the resulting harm," id. at 785, in apparent contrast to Talhouni's acts.  The court therefore proceeded to consider the insured's "capacity to form intent."  Ibid.  The court agreed that "evidence of voluntary intoxication is relevant to determining the presence or absence of intent," and upheld a trial judge's finding that Talhouni "did not know with substantial certainty that some injury would result from his conduct," because he "was completely out of touch with reality, was hallucinating and delusional, and did not know that he was assaulting another human being."[16]  Id. at

---

[16] At Casey's deposition, counsel for Williams similarly asked, "[I]s it fair to say that you did not know, essentially, that you were assaulting another human being?"  Casey answered, "Yes."  In light of Casey's admissions that he intended to touch

787. Indeed, Talhouni's LSD-induced delusionary state was so extreme that it might be inferred that he lacked even the capacity to form the intent to commit the underlying acts.[17] Ibid. In any event, Talhouni is a far cry from this case, where Casey, although intoxicated, committed the prototypical act mandating an inference of intent to do harm, admitted that he intended that act, and admitted that his anger at Williams was part of his reason for doing so.

Similarly distinguishable is Preferred Mut. Ins. Co. v. Gamache, 42 Mass. App. Ct. 194, 197-200, S.C., 426 Mass. 93 (1997), involving a policy exclusion for bodily injury caused by an insured's intentional act, which the court construed to

---

Williams and remembered punching and kicking him, we can only view this exchange as expressing a desired legal conclusion rather than as creating any genuine issue of material fact. The applicability of the "expected or intended" clause does not turn on whether the insured knew that his actions constituted an assault.

[17] "Talhouni was a wild man out of control . . . growling and mumbling in what appeared to be a foreign language" and saying as he attacked the female victim, who was a stranger to him, "kill the bitch" and "the bitch must die." Talhouni, 413 Mass. at 782 (quotation marks omitted). After the attack, Talhouni "crashed through the glass entry door" and was found "thrashing about, like a fish out of water, in the broken glass . . . oblivious to the fact that he was cutting himself" and failing to recognize that the persons who had arrived on the scene were police officers. Id. at 783 (quotation marks omitted).

require an intent to injure.[18] In Gamache, an apparently intoxicated insured, in the course of resisting arrest, lay on the ground flailing his arms and legs and then grabbed a police officer's utility belt in an effort to hoist himself to his feet; this caused the officer to lose his balance and injure his knee. Id. at 195-196. The court rejected the insurer's argument that the insured's act was of such a nature that an intent to injure could be inferred as a matter of law. Id. at 200-201. Indeed, the conduct was "arguably more neutral than the conduct at issue in Talhouni . . . and . . . Abernathy,"[19] cases in which "the insured's intent to injure was a question for the factfinder." Id. at 200, 201. Thus, the summary judgment granted to the insurer was vacated and the case remanded to resolve genuine disputes of material fact regarding the insured's "possible intoxication and its effect, if any, on his mental capacity." Id. at 201 n.8. Here, in contrast, Casey

---

[18] The exclusion denied coverage for "bodily injury . . . which results directly or indirectly from . . . an intentional act of an insured." Gamache, 42 Mass. App. Ct. at 196.

[19] In Abernathy, the insured threw a piece of blacktop at a moving car in the dark; the object shattered the car windshield and injured the driver and a child sitting in the back seat. 393 Mass. at 82, 87-88. The court held that the act, although intentional, was not by itself a sufficient basis to infer intent to injure, thus leaving a question of fact whether the insured had such an intent so as to trigger the policy exclusion. Id. at 87-88. As the Fells Acres court later explained, 408 Mass. at 399, in Abernathy, "it was possible that the injuries resulting from the insured's intentional act were accidental."

committed an act mandating an inference of intent to injure, and he admitted that he intended that act.

In short, proof that the insured had the capacity to form and did form the intent to do an act, where the nature of that act mandates an inference of intent to injure, suffices to prove the insured's intent to injure. Additional proof of the insured's capacity to form that intent to injure is not required.[20]

---

[20] We recognize that Fells Acres referred briefly to the issue of capacity to form intent to injure, 408 Mass. at 401 -- but only after concluding that the acts themselves were "intentional" and "deliberate," id. at 399, 400, and of a nature that mandated an inference of intent to injure, id. at 400. The court imposed no further burden on the insurer to prove capacity to form intent to injure, but instead observed that nothing in the claimants' evidence raised any doubts about that capacity. Id. at 401 ("Nowhere in the record is there a jot of evidence suggesting that the tort defendants were suffering from a mental disease or defect that would render them incapable of forming an intent to harm the child plaintiffs"). The court concluded its discussion by reiterating the "rule that intent to injure may be inferred from the intentional commission of an inherently injurious act." Id. at 402.

Nor do we read Talhouni's references to Fells Acres to require that an insurer prove capacity to form intent to injure. See Talhouni, 413 Mass. at 785 ("In Fells Acres, we referred again to the need to consider evidence on the capacity issue in determining whether an insured acted with the requisite intent for the purposes of the exclusion"); id. at 788 ("Fells Acres expressed the view that the parties must present evidence indicating that the insured is capable, or incapable as the case may be, of forming the intent to harm"). Where an insurer has shown that the insured had the capacity to and did form the intent to commit an act, and that act was inherently injurious, we read Fells Acres as merely leaving the door open to insureds and other claimants to attempt to show that capacity to form intent to harm was nevertheless lacking.

4.  Conclusion.  Based on Casey's own memory of the events, there is no genuine dispute that, notwithstanding his consumption of alcohol and marijuana, Casey had the capacity to form the intent, and did intend and plan, to hit Williams. Given the nature of the act, see Fells Acres, 408 Mass. at 400, Casey must be held as a matter of law to have expected or intended to cause Williams some bodily injury.  The judge therefore did not err in ruling that the policy exclusion for bodily injuries expected or intended by the insured relieved Liberty Mutual of its duties to defend and to indemnify Casey and to pay medical benefits to Williams.[21]

Judgment affirmed.

---

[21] Williams also challenges the award of statutory costs to Liberty Mutual.  Liberty Mutual responds that it is not seeking such costs.  The sole authority cited by Williams, John T. Callahan & Sons, Inc. v. Worcester Ins. Co., 453 Mass. 447 (2009), focuses on one insurer's recovery of attorney's fees from another.  It does not establish any exception, for actions by insurers against insureds to resolve coverage and similar disputes, to the general rule that prevailing parties are entitled to their costs.  See G. L. c. 261, § 1; Mass.R.Civ.P. 54(d), as appearing in 382 Mass. 821 (1980).  See also G. L. c. 231A, § 7 (in action solely for declaratory judgment, costs lie wholly in court's discretion).  We therefore decline to disturb the judgment on this point.  The parties may, of course, raise the issue in the trial court.